COLE, Chief Judge.
*405 Federal courts sitting in diversity may question the wisdom of state laws, but they are powerless to change them. For better or worse, Connecticut imposes liability for breaches of contract when attended by deception. Unhappy with flanges purchased under a contract with PM Engineered Solutions, Inc. ("Powdered Metal"), Bosal Industries-Georgia, Inc. ("Bosal") decided to switch suppliers and terminate the contract. After a five-day bench trial, the district court found that the termination was not only wrongful in breach of the contract, but that it was deceptive in violation of the Connecticut Unfair Trade Practices Act. Because Connecticut law applies and the district court's findings rest on a permissible view of the evidence, we affirm except as to the calculation of postjudgment interest on damages.
I. BACKGROUND
Powdered Metal was itching to get into the automotive industry. The powdered metal flange was its ticket. Through an independent sales representative, it offered to supply the part to Bosal. After welding the flanges onto exhaust pipes, Bosal would sell the assembled part to a third manufacturer, DMAX, who would then use the flange to mount the exhaust system to diesel engines sold to General Motors.
The parties entered into a contract, which took the form of a quote accepted by Bosal. Powdered Metal agreed to supply 90,000 flanges per year with a monthly output of 7,500 flanges, which were to be delivered to Bosal in Connecticut. Connecticut was also the state where Powdered Metal operated and manufactured the flanges. Initial orders would not be fulfilled until sixteen weeks after the flange specifications were finalized in early June 2014. This lead time would allow Powdered Metal to make any necessary arrangements to fulfill the orders, such as obtaining raw materials and training employees.
Sixteen weeks was not soon enough. Due to mounting pressure from DMAX, Bosal demanded delivery of the first batch of flanges by late June 2014 and an increased monthly output moving forward. This was not an idle demand. Failure to comply with its demands would put a kink in the supply chain and shut down the General Motors assembly line. And if it did not comply, Bosal warned that it, DMAX, or General Motors would "crush" Powdered Metal with litigation or chargebacks of a million dollars a day. Powdered Metal gave in to Bosal's demands.
*406 Manufacturing problems quickly emerged. Cracks in the flanges began to appear in early July and production temporarily moved from Connecticut to Illinois in August after a machine press failed on two occasions. After the cracks became more prevalent in later shipments, Bosal instructed Powdered Metal in mid-October to halt production so that it could identify the root cause of the cracked flanges.
Two months passed without a word from Bosal. Its silence gave rise to speculation. In a late October email to Powdered Metal from its parent company, PSM Industries, Inc., one executive surmised that Bosal "went deep and silent" because it "went back to an earlier design with ... a stamped flange" and switched suppliers. (Trial Ex. 97, Appx. 0037.) But there was still a belief that new orders would come in after completing the root cause investigation.
As it turned out, Bosal had switched suppliers. It had been talking with suppliers in secret as early as late September and by mid-October, the same time it halted production at Powdered Metal, it had already finalized its decision to switch to a different supplier and to terminate the contract with Powdered Metal. Meanwhile, Bosal told Powdered Metal it was completing a root cause investigation, accepted additional flanges, and applauded it for its "continued support to return to a normalized situation where we can fill the pipeline." (Trial Ex. 48, Appx. 0030.) It did not notify Powdered Metal of its decision to terminate the contract, however, until December 12.
Powdered Metal then brought a claim against Bosal under the Connecticut Unfair Trade Practices Act. After a five-day bench trial, the district court found that Bosal's termination of the contract was not only wrongful, but that its conduct in doing so was "clearly misleading and intentional"-and thus deceptive in violation of the Act. (R. 123, PageID 4129-30.) The district court awarded Powdered Metal $784,360 in attorneys' fees under the Act, $51,550 in discovery sanctions, and $216,934.44 in damages for a related breach-of-contract claim, including postjudgment interest on damages at the Connecticut statutory rate of ten percent. Both parties appealed.
II. ANALYSIS
We review the district court's findings of fact for clear error and its conclusions of law de novo in an appeal from a judgment entered after a bench trial. Byrne v. United States , 857 F.3d 319, 326 (6th Cir. 2017). Mindful of our deference to factual findings, we conclude that the district court did not err in holding that Bosal's wrongful termination of the contract violated the Connecticut Unfair Trade Practices Act based on its finding of attendant deception. Nor was its determination of fees and damages an abuse of discretion apart from its calculation of postjudgment interest.
A. Choice of Law
As an initial matter, we agree with the district court that Connecticut law is the proper choice of law, so that Powdered Metal's claim properly arises under the Connecticut Unfair Trade Practices Act.
We are presented here with a choice between Connecticut and Michigan law. In choosing between them, we must apply the choice-of-law rules of Ohio as the forum state, which has adopted the two-step approach set forth in the Restatement (Second) of Conflict of Laws. Klaxon Co. v. Stentor Elec. Mfg. Co. , 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) ; Morgan v. Biro Mfg. Co. , 15 Ohio St.3d 339, 474 N.E.2d 286, 288 (1984). The first step is to determine if there is an actual conflict *407 between the substantive laws of the states involved. Glidden Co. v. Lumbermens Mut. Cas. Co. , 112 Ohio St.3d 470, 861 N.E.2d 109, 115 (2006). Only if they conflict must we proceed to the second step to choose between them. Morgan , 474 N.E.2d at 288-89.
There is no real dispute that the two states' laws conflict. Connecticut recognizes the type of claim brought against Bosal, while Michigan forecloses it. Michigan, like Connecticut, prohibits unfair trade practices under the Michigan Consumer Protection Act. Compare Mich. Comp. Laws § 445.903(1), with Conn. Gen. Stat. § 42-110b. Unlike Connecticut law, however, it does not apply to the type of business transaction at issue here. Instead, it applies only to "the conduct of a business providing goods, property or services, primarily for personal, family or household purposes." Slobin v. Henry Ford Health Care , 469 Mich. 211, 666 N.W.2d 632, 634 (2003) (quoting Mich. Comp. Laws § 445.902(d) ).
The dispute is one of choice. For claims sounding in tort, as here, we must choose the law of the state with "the most significant relationship to the occurrence and the parties." Restatement § 145(1); see Bailey Employment Sys., Inc. v. Hahn , 655 F.2d 473, 475 (2d Cir. 1981). To make that determination, we are instructed to consider:
(1) the place of business of the parties;
(2) the place where the injury occurred;
(3) the place where the conduct causing the injury occurred;
(4) the place where the relationship, if any, between the parties is centered; and
(5) any factors under Section 6 that we may deem relevant to the action.
Morgan , 474 N.E.2d at 289 (citing Restatement § 145(2) ). These factors are to be evaluated according to their relative importance to the issue presented. Id. (citing Restatement § 145).
As is often the case in multistate disputes, many of the location-based factors point in opposite directions. Powdered Metal's principal place of business is in Connecticut, while Bosal's is in Michigan. And Powdered Metal suffered financial injuries in Connecticut, while Bosal's conduct causing those injuries occurred primarily in Michigan. No matter how Bosal puts it, the place of business of nonparty entities, like General Motors, has no place in an inquiry that expressly looks to the location of "the parties." Restatement § 145(2)(c).
The remaining factors point in the direction of applying Connecticut law. The relationship between the parties is centered in Connecticut. It is true that Powdered Metal initiated the relationship through an independent sales representative in Michigan. But it did not remain centered there for long. The remainder of the relationship centered around the purchase of flanges under the contract, nearly all of which were manufactured in Connecticut. They were also delivered there. Under the law of both states, "title passes to the buyer at the time and place at which the seller completes his performance with reference to the delivery of goods." Mich. Comp. Laws § 440.2401(b) ; Conn. Gen. Stat. § 42a-2-401. Because the contract specifies "F.O.B. (Watertown, CT.)," Powdered Metal completed performance-and ownership of the flanges transferred to Bosal-in Connecticut. (Trial Ex. 5, Appx. 0020.)
Taking into account the interests of each state in having its own law applied under Section 6 of the Restatement confirms that Connecticut law should apply. Restatement § 6(2)(c). Michigan unquestionably has an interest in protecting its businesses from *408 excessive liability for unfair trade practices. See In re Air Crash Disaster Near Chicago, Illinois on May 25, 1979 , 644 F.2d 594, 613-14 (7th Cir. 1981). But the state with the "strongest interest" in regulating unfair trade practices, whether liability is imposed or foreclosed, is the state where the harm occurred. See Pilgrim v. Universal Health Card, LLC , 660 F.3d 943, 946 (6th Cir. 2011). Because the harm occurred in Connecticut, it is Connecticut that has the strongest interest.
The parties do not contend that any other Section 6 factor is relevant, save for one. Bosal contends that applying Michigan law would provide "certainty, predictability, and uniformity of result" in its disputes with other suppliers. Restatement § 6(f). As we see it, the only uniformity concern in applying Connecticut law is that Bosal may be subject to liability in some disputes, but not others. That is not the sort of variation that concerns us. Uniformity concerns come into play when applying different laws to the same contract. Mill's Pride, Inc. v. Cont'l Ins. Co. , 300 F.3d 701, 710 (6th Cir. 2002). And there is no indication that Bosal's unspecified contracts with other suppliers include the same terms as the one with Powdered Metal, especially given that it was Powdered Metal that drafted the contract.
B. Connecticut Unfair Trade Practices Act
The wrongful termination of the flange contract, paired with Bosal's attendant deception, violated the Connecticut Unfair Trade Practices Act. The Act prohibits any person from engaging in "unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). To prevail, a plaintiff must prove: (1) an unfair or deceptive act or practice, (2) an ascertainable loss, and (3) causation-that the loss was realized as a result of the improper act or practice. Id. § 42-110g(a).
Under the Act, deceptive conduct extends to simple breaches of contract when accompanied by intentional misrepresentations. Naples v. Keystone Bldg. & Dev. Corp. , 295 Conn. 214, 990 A.2d 326, 337-38 (2010) (collecting cases). On this point, the parties agree. The disagreement centers not on a question of law, but on whether the contract was breached and whether Bosal made an intentional misrepresentation as part of that breach. We review the district court's factual findings on these issues for clear error. Byrne , 857 F.3d at 326.
The termination was wrongful in breach of the contract because Bosal's two-month delay failed to provide reasonable notice of termination. It is true that the contract does not specify a precise end date, so that it is terminable at will. Conn. Gen. Stat. § 42a-2-309(2). Under Connecticut law, however, contracts of indefinite duration still require "reasonable notification" of termination. Id. § 42a-2-309(2).
Through its silence and secret dealings, Bosal also intentionally misled Powdered Metal into believing that it planned to fulfill the contract. It did so by accepting additional flanges from Powdered Metal and, on October 6, highlighting Powdered Metal's "continued support to return to a normalized situation where we can fill the pipeline," all the while knowing that it had already decided to switch suppliers. (Trial Ex. 48, Appx. 0030.) Indeed, an internal email suggests that Bosal decided to switch suppliers as early as September 19, 2014 (Trial Ex. 207, Appx. 0237-0239) and had reached an agreement with a new supplier (SSI) by October 3, 2014 (Trial Ex. 29, Appx. 0078-0079.) Although the district court's opinion does not explicitly reference these emails, we may affirm on any grounds supported by the record. See *409 Lawrence v. Chancery Court of Tennessee , 188 F.3d 687, 691 (6th Cir. 1999). If that were not enough, Bosal indicated on October 13 that it was halting production not because of its decision made by that time to terminate the contract, but "due to the ongoing root cause analysis." (Trial Ex. 26, Appx. 0076.) And, as the district court found, Bosal and Powdered Metal continued to engage in root cause analysis until December, even starting a new phase of the analysis called density testing "after Bosal decided to switch flange suppliers." (R. 123, PageID 4125.) Instead of dispelling the belief that new orders would come in after completing the analysis, Bosal chose to conceal its decision to terminate the contract even as it strung Powdered Metal along during this period.
Bosal would have us interpret its silence as reasonable notification of termination, pointing to a late October email from PSM Industries to Powdered Metal surmising the same. In that email, one executive speculated that it "[l]ooks like they went back to an earlier design with ... a stamped flange" and switched suppliers. (Trial Ex. 97, Appx. 0037.) But one executive's speculation does not amount to knowledge, let alone notice of termination. And even if that interpretation were permissible, the district court's interpretation after a five-day bench trial that it did not amount to notice is equally so. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer City, N.C. , 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). It is with that principle in mind that we also reject Bosal's contention that its representations were anything other than intentionally misleading.
Finally, Powdered Metal has met its minimal burden to show that it suffered an ascertainable loss as a result of the deception. A plaintiff need only prove that the deceptive conduct was the proximate cause of a loss that is "capable of being discovered, observed or established." Hinchliffe v. Am. Motors Corp. , 184 Conn. 607, 440 A.2d 810, 815 (1981). As the district court found, the deception deprived Powdered Metal of the remaining value of the contract and potential customers. The remaining value of the contract may not extend beyond the reasonable notification period and Powdered Metal declined to seek damages for lost customers. But these shortcomings merely serve to limit or foreclose its ability to recover damages. Powdered Metal may still recover reasonable attorneys' fees under the Act. Serv. Rd. Corp. v. Quinn , 241 Conn. 630, 698 A.2d 258, 265 (1997).
C. Attorneys' Fees
The district court acted within its discretion in awarding attorneys' fees to Powdered Metal. See Conn. Gen. Stat § 42-110g. The amount is challenged by both parties, so it should come as no surprise that Bosal argues for less, while Powdered Metal argues for more. We ordinarily defer to a district court's determination of a fee award and will overturn its decision only if it abuses its discretion. Hayes v. Comm'r of Soc. Sec. , 895 F.3d 449, 452 (6th Cir. 2018).
Fees awarded for unsuccessful breach-of-contract and unfair trade practice claims are a major source of heartburn for Bosal. But the district court was permitted to do so because there is no reasonable basis for segregating the time expended on them. Fabri v. United Techs. Int'l, Inc. , 387 F.3d 109, 130 (2d Cir. 2004) (interpreting Connecticut law). To the contrary, the claims were intertwined because they all arose from a single contract premised on the same dispute. Cf.
*410 Jacques All Trades Corp. v. Brown , 57 Conn.App. 189, 752 A.2d 1098, 1105 (2000) (denying attorneys' fees for an unsuccessful breach-of-contract claim where the unfair trade practices claim related to a different contract).
For its part, Powdered Metal complains of reductions in the hourly attorney rates and total fee amount. But the district court acted well within its discretion. In reducing rates for out-of-district attorneys, the district court balanced a set of competing presumptions-that the prevailing district rate and the higher rate paid by Powdered Metal are reasonable-against relevant factors under Connecticut law, including the lack of difficulty in the issues presented. See Romag Fasteners, Inc. v. Fossil, Inc. , 2015 WL 5787019, at *2-3 (D. Conn. Sept. 30, 2015), vacated in part on other grounds , 866 F.3d 1330 (Fed. Cir. 2017) ; Steiger v. J.S. Builders, Inc. , 39 Conn.App. 32, 663 A.2d 432, 435-36 (1995). It was reasonable for the district court to then reduce the total fee amount by twenty percent, rather than parse the billing records for unrecoverable fees. Powdered Metal failed to exclude fees that even it agreed were not recoverable. It is not the role of the district court to serve as its green-eyeshade accountant. Fox v. Vice , 563 U.S. 826, 838, 131 S.Ct. 2205, 180 L.Ed.2d 45 (2011).
Powdered Metal has no shortage of complaints. It challenges numerous other aspects of the fee award, including fees for paralegals, litigation support staff, and work on this appeal, in addition to fees for a discovery sanction. We find no abuse of discretion in the district court's reasoned determination of the fees within these categories.
D. Postjudgment Interest
We agree with both parties that the district court made a mistake of law in calculating postjudgment interest on damages flowing from Powdered Metal's separate breach-of-contract claim according to Connecticut's statutory rate of ten percent. In diversity cases, federal law controls postjudgment interest under 28 U.S.C. § 1961. Estate of Riddle ex rel. Riddle v. S. Farm Bureau Life Ins. Co. , 421 F.3d 400, 409 (6th Cir. 2005). Interest shall be calculated from the date of the judgment according to the weekly average one-year constant maturity Treasury yield for the preceding calendar week. 28 U.S.C. § 1961(a).
III. CONCLUSION
We affirm in part and reverse in part the judgment of the district court.
CONCURRING IN PART AND DISSENTING IN PART